# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**JULIAN RODNEY ROOKS, JR.,**

    **Plaintiff,**

**VS.**

**ST. MATTHEWS UNIVERSITY., et al**

**SALLIE MAE, INC., et al**

    Defendants,

**Case No. 4:16cv39-MW/CAS**

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

**FILED *IN CAMERA* AND UNDER SEAL**

Causes of Action:

1.Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), (2 counts).

2. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;, in violation of the False Claims Act, 31 U.S.C. § 3729 (a)(1) (A), (4 counts).

Plaintiff and Realtor Julian Rodney Rooks Jr. allege as follows:

## I.  Introduction

1. This is an action to recover damages and civil penalties arising out of false claims approved

and presented by Defendants to obtain at least $27,805 dollars from the United States Department of Education (DOE) pursuant to the Higher Education Act, Title IV ("HEA").

2. Defendant SMU lost the Plaintiff's medical school records.

3. Defendant SMU covered up the loss of the Plaintiff's medical school records.

4. It was the Defendant SMU's concealment of the loss of the Plaintiff's records that caused the presentation of claims for payment.

5. These claims were false claims because SMU used substantial misrepresentation, fraudulent concealment, a false statement, a fraudulent inducement, and a prohibited transaction used as an incentive, in making the contract.

6. Defendant Sallie Mae, presented the claims with deliberate indifference and disregard as to the truth of their claims.

7. Realtor asserts causes of action under the False Claims Act for submission of knowingly false or fraudulent claims paid or approved, in violation of 31 U.S.C. § 3729(a)(1)(A) (2 counts), and 31 U.S.C. § 3729(a)(1)(B) (4 counts).

## II. Jurisdiction and Venue

8. This action is brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729 et seq..

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C §1331, and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

10. This case arises from the wrongful conduct of the Defendants in obtaining funds from the United States Department of Education under the Higher Education Act, Title IV.

11. Under 31 U.S.C. § 3732, "Any action under 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant, can be found, resides,

transacts business, or in which any act proscribed by section 3729 occurred."

12. Venue is proper in the Northern District of Florida because Defendants maintain, transact and operate businesses and are Corporations within the Eleventh District.

13. This Court has personal jurisdiction over the Defendants under 31 U.S.C. §3732(a).

### III. Plaintiff

14. *Qui Tam* Plaintiff Julian Rodney Rooks Jr. is a citizen of the United States of America and is a resident of Leon County, in the State of Florida. Plaintiff is a graduate of, and was a medical student attending, Defendant SMU's medical school from January, 1999 to June 2002 and was also a student at Defendant St. Joseph's College of Maine. Relator is the unique and original source of the evidence provided in this Complaint.

### IV. Defendants

15. Defendant SMU is a medical school, "approved" by the State of Florida and licensed by the State of Florida whose "Principal Place of Business" is in Orlando, Florida.

16. St. Joseph's College of Maine (SJC), is an educational institution located in Standish, Maine. SJC offered a Graduate degree study program to SMU students as well Title IV Stafford loans. It was SJC's Title IV Stafford Loan Program that was the source of the HEA funds at issue in this Complaint.

17. Sallie Mae is the Servicer for all of the loans at issue in this Complaint.

### V. Events

18. In late 1998, I was looking for a medical school that had US government student loans.

19. SMU's Vice President, Dr. Jerry Thornton told me that SMU had US Government student loans.

20. SMU is not, and was not at the time an "eligible education institution" under 26 USC221(d) (1) and (2).

## "Substantial misrepresentation" under 34 C.F.R. § 668.71(c).

21. Dr. Thornton knowingly made a "substantial misrepresentation" as defined under 34 C.F.R. §668.71(a)(4)(c) when he substantially misrepresented the eligibility of his school (SMU) to receive the Title IV HEA funds at issue in this complaint.

22. Dr. Thornton offered to send a catalog and, based upon Dr. Thornton's statements and our conversation, I accepted and SMU sent a catalog to me in Tallahassee, Florida along with a letter with SMU's "Vice President" Dr. Thornton's picture and signature on it. This catalog has 30 pages.

## Fraudulent Concealment

23. Not one single word in this catalog mentions St. Joseph's College of Maine (SJC) or any "cost-sharing" tuition program. SMU's failure to disclose the involvement of that second institution (SJC) anywhere in this catalog creates the illusion of it's nonexistence.

## False Statement

24. Page 11 states "Tuition at St. Matthew's is $6,400 per semester.". Plaintiff believes this statement is not a true statement.

25. Dr. Thornton himself stated SMU tuition cost per semester as "SMU note till graduation*- 2,400" and "Balance owed SMU $3,250". Plaintiff believes that $2,400 plus $3,250 equals $5,650, not $6,400.

26. Plaintiff believes $5,650 was the true cost, per semester, of SMU tuition, not $6,400 as stated.

27. Plaintiff believes that $5,650 plus $750 equals $6,400.

28. SMU's catalog fails to disclose that $750 is for tuition at another institution (SJC) and Plaintiff believes this omission was designed to conceal the involvement of that second institution

(SJC).

29. SMU's attorney, Rodger Courtney was SMU's "Special Counsel" from "May 1998-May 2001".

30. Plaintiff believes Mr. Courtney performed a primary role in establishing this financial aid and this marketing catalog.

31. A few days before leaving for SMU, Dr. Thornton told Plaintiff how important it was to sign up for a graduate program offered by St. Joseph's College of Maine.

32. Plaintiff had no interest in such a program but Dr. Thornton said that this was how to pay tuition to SMU.

33. Dr. Thornton offered to allow Plaintiff to attend SMU at a discount with that discount deferred "till graduation".

34. Plaintiff felt it was an offer he could not refuse and applied to St. Joseph's College of Maine's graduate program and the Florida State University (FSU) sent official transcripts to SJC about a month after it sent official transcripts to SMU.

## **Fraudulent Inducement**

35. Dr. Thornton's offer to "hold a note on you for $2,400 per semester" was an act of fraudulent inducement because it was Dr. Thornton's intent to obtain funds from the United States by inducing the Plaintiff to act.

35. On Wednesday, March 10, 1999, at 7:13 am, Plaintiff emailed SMU's Vice President, Dr. Jerry Thornton, notifying him of the arrival of a Stafford loan, identifying this loan to him as a Stafford Loan and asking Dr. Thornton to reaffirm how much Plaintiff should pay in "tuition" to SMU from this Stafford loan.

36. About three hours later, at 10:30 am, Dr. Thornton reaffirmed the oral contract and memorialized this agreement as a written contract "the contract" and directs Plaintiff to use this

Stafford loan to pay tuition to SMU.

37. The next day, March 11, 1999, at 12:40 pm, Dr. Thornton reaffirmed the contract again in a separate email, and later that same day, March 11, 1999, Plaintiff paid SMU $3,250 for tuition from this Stafford loan and SMU cashed the check.

38. When the next US Government Stafford loan arrived Plaintiff paid SMU $3,250 for tuition again and SMU cashed that check also.

39. SMU is not, and was not at the time an "eligible education institution" under 26 USC 221(d) (1) and (2). The fact that these student loans were not to "an eligible education institution" under 26 USC 221(d)(1) and (2) means that they are not "qualified education loan(s)" under 11 USC 523(a)(8) (B).

### Use of a "prohibited transaction" under 34 C.F.R. § 682.212(a)(1) and (2), as an "incentive".

40. Dr. Thornton described a payment from this loan as an "incentive" to participate in the program. This "incentive" was a "prohibited transaction" under 34 C.F.R. § 682.212(a)(1) and (2), and this "incentive" is also an "unlawful payment" under 20 U.S.C. § 1097(c).

41. Dr. Thornton told the Plaintiff that SMU's attorney would personally assist Plaintiff in obtaining student loans. Dr. Thornton said his name was Rodger Courtney. Dr. Thornton gave Plaintiff Mr. Courtney's number and told Plaintiff to call him.

42. Plaintiff called Mr. Courtney. Mr. Courtney told Plaintiff that he was SMU's attorney

43. On 8-22-2000, at 17:09, eastern time, Mr. Courtney sent a fax from 703-764-2509 at "GLOBAL ED RESOURCES", to Plaintiff in Tallahassee, Florida detailing a loan from Student Finance Corporation (SFC). This document states *"Funds will be wired to St. Matthews"*. Under "Major Benefits" this document states " The SFC program allows the student to clear balances due to the

school, to allow continuation of studies, be assigned a clinical rotation, and be allowed to graduate and receive transcripts."

44. One month later, on 9-22-2000, the State of Florida administratively dissolved SMU.

45. About three months later, in December 2000, SMU's Registrar, Gloria Miranda-Avila "Gloria", told Plaintiff that clinical rotations were ready in Chicago. Gloria told Plaintiff to apply for this SFC loan with my parents as cosigners.

46. At this time, SMU failed to possess a license to conduct business in the State of Florida and SMU was not licensed to offer or execute contracts with Florida consumers.

47. Gloria at SMU and Porsche at SFC told Plaintiff that the loan, for $29,000, was approved on or about January 4, 2001.

48. Plaintiff relied on Gloria and Porsche's statements and moved from Tallahassee, Florida to Chicago, Illinois on or about January 9, 2001, and began clinical rotations and began making monthly payments of $394.22 to SFC.

49. Plaintiff failed to receive the loan for $29,000 as promised.

50. Throughout March, April and May of 2001, Plaintiff asked Dr. Thornton, SMU's registrar Gloria, and others in SMU's office about the status of this loan. They told Plaintiff that they were working to resolve the issue.

51. On or about May 15, 2001, Plaintiff called SFC. Plaintiff asked SFC to send Plaintiff's payment history and SFC did, at 12:46 pm, central time, showing all payments made (totaling $1,576.88) on time and in full.

52. Plaintiff asked a Mr. Pearson if the loan would be disbursed but he refused to answer. Plaintiff told him that Plaintiff could not continue to make large payments on a loan Plaintiff was not going to receive and that Plaintiff would stop paying SFC if he could not give Plaintiff an answer. Mr. Pearson continued to repeat "SFC no longer does business with SMU", and he referred Plaintiff back to

SMU.

### Loss of Plaintiff's medical school records occurs here.

53. A news article published on June 14, 2001, states that on June 4, 2001, an injunction barred certain individuals from entering SMU and that Dr. Thornton was the new president and Gloria Miranda-Avila is the new Director of Financial Aid.

54. Another article published on June 28, 2001 states that "before the injunction was served" on June 4, 2001, individuals "...were seen removing files from administrative offices." and "Witnesses observed shredded material in these offices..." and Dr. Michael Harris posted a letter on June 2, 2001 stating "All property of St. Matthews University is to be made available to the officers of the Corporation...".

55. A 2005 report by the State of California states that in the summer of 2001, there was "serious turmoil" at SMU "resulting in the eventual loss of all facilities there".

56. SMU lost Plaintiff's medical school records during this incident.

57. SMU had a duty to keep these records.

58. Plaintiff was not aware that the records had been lost and that Plaintiff had a cause of action because SMU failed to tell Plaintiff that it lost the records when SMU had a duty to keep the records.

59. SMU performed certain acts to cover up the loss so that Plaintiff would not notice the loss.

60. Damages flow from SMU's failure to keep these medical school records.

61. Damages flow from SMU's concealment of the loss of these medical school records.

### Act of Fraudulent Concealment (count 1)

62. On June 13, 2001 at 4:57 pm, central time, (3:57 pm eastern time) Plaintiff called SMU's attorney, Rodger Courtney, to ask him if he knew anything about the loan.

63. About 10 days after these above events, described by the State of California as "serious

turmoil" and "loss", Plaintiff spoke with Rodger Courtney for 8 minutes.

64. Mr. Courtney gave Plaintiff no indication whatsoever that these events had taken place about 10 days earlier.

65. Mr. Courtney failed to tell Plaintiff that SMU had lost my medical school records.

### Affirmative Act of Fraudulent Concealment (count 2)

66. On July 5, 2001, Plaintiff spoke with Mr. Courtney again for 12 minutes.

67. Mr Courtney gave no indication whatsoever that he was no longer working for SMU.

68. Mr. Courtney's statements and directions led Plaintiff to believe just the opposite was true.

69. Mr. Courtney said he was still working to resolve the failed GER/SFC loan.

70. Mr. Courtney said that Plaintiff would have to start paying SFC again.

71. Minutes after the call with Mr. Courtney, Plaintiff called his parents in Tallahassee, told them what Mr. Courtney said Plaintiff should do and the next day, Plaintiff started paying SFC again on Mr. Courtney's advice.

71. Again, for the second time, Mr. Courtney failed to disclose a material fact (SMU lost Plaintiff's medical school records).

72. Again, for the second time, Mr. Courtney painted a misleading and deceptive picture.

73. Mr. Courtney could foresee that the loss of Plaintiff's medical school records had transformed his misrepresented Federal Stafford loans, and other loans into "toxic ticking time bombs" and that when those Stafford loans defaulted, if the lenders failed to do due diligence, they would file claims with the United States and be reimbursed by the United States and that those claims would be "False Claims" because SMU was not an "eligible education institution" within the meaning of 26 U.S.C. 221(d)(1) and (2).

74. Damages flow from Mr. Courtney's failure to keep his promise to lend Plaintiff's $29,000 (exhibit 87), his repeated failure to disclose a material fact (the loss of Plaintiff's medical school

records), his false statements ("primary role in...financial aid and marketing"), his failure to disclose other material facts and from his directions to do something (continue to pay SFC) designed to further the deception.

### Release of Unknown Claims
### Affirmative Act of Fraudulent Concealment (count 3)

75. About six weeks after these calls with Mr. Courtney, on or about 8-19-2001, SMU's registrar, Gloria and Dr. Thornton told Plaintiff that the SFC loan offered by Mr. Courtney's company GER, was ready to be disbursed.

76. Dr. Thornton said that first, Plaintiff would have to sign paperwork that would allow SMU to "initiate the transfer" as stated in his letter included in a 5-page fax sent from SMU in Florida to Plaintiff in Chicago on 8-20-2001 at 12:55 pm, central time.

77. Plaintiff was told by Gloria to fax the documents back to SMU but Gloria gave Plaintiff a number different from the one she wrote on the fax.

78. Whoever was the owner of fax number 302-467-4032, on August 22, 2001 is the person who received the release of claims.

79. Dr. Thornton and SMU's Registrar Gloria, knowingly made false statements to Plaintiff using the promise to release the GER/SFC loan offered by Mr. Courtney's company to trick Plaintiff into signing these documents promising not to tell anyone what had happened and releasing "unknown claims", furthering the concealment of a material event (the loss of the records) of which Plaintiff had no knowledge.

80. SMU was not licensed to conduct business in the State of Illinois or in the State of Florida, having been administratively dissolved as a corporation by the State of Florida exactly eleven months earlier on 9/22/2000.

81. Plaintiff believes he was justified in assuming that the "Nondisclosure" clause referred to

the SFC loan and not the loss of the records and the Defendants used this agreement to silence the Plaintiffs and to attempt to release "unknown claims", furthering the concealment of the lost records.

82. Dr. Thornton's written statements are not just a promise unfulfilled. SMU had no intention of honoring this agreement because SMU failed to make any of the the "seven equal installments of $1,035.71" that Dr. Thornton had promised to make in his letter.

83. Dr. Thornton knowingly makes this false statement when he writes "Student Finance Corporation has agreed to fund the "reserve" amount beginning immediately" because Plaintiff spoke with Mr. Pearson at SFC about three months earlier and he said "SFC no longer does business with SMU".

84. Plaintiff relied on the illusion of resolution created by SMU's Vice President Jerry Thornton, it's attorney Rodger Courtney,  and SMU's Registrar, Gloria, and they skillfully used that illusion to lie to the Plaintiff and to trick the Plaintiff in a coordinated fashion.

85. Damages flow from Rodger Courtney's associated misrepresentations, from Dr. Thornton's false statements, from SMU's Registrar Gloria's false statement and from their acts to conceal the loss of the records.

86. About 30 days later, on or about 9-21-2001, Plaintiff received a bizarre letter from Sallie Mae stating "We are deeply sorry for this error", that my "personal information" was not "protected" and that an "error" occurred. This elaborate story Sallie Mae holds out about email attachments is not reasonable. Plaintiff did not receive any such email, attachment or letter, and in the context of what Plaintiff now understand about this case, Plaintiff believe the true meaning of SLM's letter is that SLM improperly shared Plaintiff's personal information with one or more of the defendants in this case.

87. Plaintiff wrote to Sallie Mae asking for more information about this but Sallie Mae failed to respond as required of a loan servicer under 34 C.F.R. § 682.208(c)(1).

88. Federal law regulates the business of servicing loans provided under 20 U.S.C. § 1070 et. Seq..

89. SLM's license to conduct business in the State of Illinois was "withdrawn" on "7-24-01".

90. SLM was not licensed to conduct business in the State of Illinois when it sent this letter and subsequent letters.

91. SMU was reinstated as a Florida LLC on December 10, 2001.

92. Plaintiff's request judicial notice of the laws of the State of Florida. The Florida Statutes

(FS) § 605.0714 (5)
A limited liability company that has been administratively dissolved continues in existence but may only carry on activities necessary to wind up its activities and affairs, liquidate and distribute its assets, and notify claimants under ss. 605.0711 and 605.0712.

93. Plaintiff believe that these SMU activities, between when it was dissolved in 9/2000 and when it was reinstated in 12/2001, are not "activities necessary to wind up it's activities and affairs" and these acts fail to comply with FS § 605.0714(5).

94. Plaintiffs believe SMU's failure to comply with FS §605.0714(5) means SMU was not eligible for reinstatement under FS § 605.0715.

95. When SMU failed to make any of the payments Dr. Thornton had promised, Plaintiff called SMU.

96. SMU said it would replace the SFC loan with a loan from SMU itself, told Plaintiff to expect the paperwork and asked Plaintiff to be patient.

97. Around this time, SMU used the US mail to send the documents to Plaintiff.

98. SMU's Registrar Gloria said that SMU would now act as the lender itself. Gloria instructed me, my Mother and my Father to sign these papers and to "back-date" it to 01/17/2001, because she explained that this was "replacing" the SFC loan for $29,000.

99. Plaintiff began making payments directly to SMU instead of SFC.

**Affirmative Act of Fraudulent Concealment (count 4)**

100. Plaintiffs believes these 2 sets of documents to each be an act of fraudulent concealment

because they introduce previously non-existent conditions such as nondisclosure and arbitration requirements while failing to mention that SMU had lost my medical school records.

### The Cook County Hospital (CCH) rotation in Trauma Surgery

101. From 5/6/2002 to 5/31/2002, Plaintiff performed a senior clerkship in trauma surgery at Cook County Hospital (CCH) in Chicago, Illinois. This rotation was performed at a Graduate Medical Education (GME) training program, accredited by the Accreditation Council for Graduate Medical Education (ACGME), a Federally funded program under the U.S. Department of Health and Human Services. Because this was a GME training program, certain requirements had to be met. One of those requirements was " An official transcript showing clerkships completed,.... . Please Note: The application and transcript must be sent by the medical school. **Applications received directly from you will not be processed.**".

102. SMU lost the Plaintiff's records 11 months earlier, in June of 2001.

103. If SMU failed to send the records the Plaintiff would not have been allowed to do the rotation, the rotation would have come to a full stop and the loss of the records may have been discovered at that time.

### Affirmative act of Fraudulent Concealment (count 5) Criminal Conspiracy between SMU and it's Clinical Coordinator to conceal the loss of the records.

104. On May 3, 2002, at 12:11pm (central time) a fax was received by CCH. It was sent from SMU's Clinical Coordinator, Dr. Frank Apantaku M.D., in Chicago.

105. SMU fabricated the missing transfer records and its own missing records from 1999 and sent them to CCH, further concealing the loss of the records.

### "False statements relating to healthcare matters" under 18 U.S.C. § 1035; "Definitions relating to Federal Health care Offenses" under 18 U.S.C § 24  (2 COUNTS)

106.    The Graduate Medical Education (GME) program at Cook County Hospital is a Federally funded program under the U.S. Department of Health and Human Services. This GME program is a "health care benefit program" under 18 U.S.C. § 24 (b) and 18 U.S.C. § 1035 (b). The made-up, false records SMU sent to this program twice, are each "False statements relating to health care matters" under 18 U.S.C. § 1035 (a)(1)(2) and "Federal health care offenses" under 18 U.S.C. § 24 (a)(1).

107. SMU irreversibly and permanently damaged Plaintiff and did end Plaintiff's medical career when it pushed the "send" button on it's fax machine at 12:11pm (central time), on May 3, 2002, sending made-up, false records to a GME program at Cook County Hospital.

**Affirmative act of Fraudulent Concealment (count 6)**

108. 5 days later, on May 8, 2002, at 04:56pm (central time), another fax was received by Cook County Hospital directly from SMU's office in Florida.

109. SMU irreversibly and permanently damaged Plaintiff again and did seal the end of my medical career when it pushed the "send" button again on it's fax machine at 4:56pm (central time) on May 8, 2002.

110. Sending made-up records again, further concealed the loss.


**Affirmative act of Fraudulent Concealment (count 7)**

111. There will also be another fax, sent from SMU in Florida to Dr. Apantaku's office and consisting of at least 2 pages, probably sent on the morning of May 3, which Dr. Apantaku then passed along to CCH as pages 13 and 14 of his fax on May 3, 2002 . It was the first fax in this set of 3 faxes and it shows that SMU's Clinical Coordinator in Chicago, Dr. Apantaku, combined records from SMU's Florida office, which he knew were false, with his own records which he also knew were false, and then faxed those false records to the GME program at CCH.

112. Dr. Apantaku cannot claim that he did not know the records were lost, and that the records he was passing on to CCH were fabricated because Dr. Apantaku had made up a variety of excuses for failing to release the grade for every final exam taken in his office after June, 2001.

113. Dr. Apantaku sent false records as well. For example, Plaintiff has never met "Dr. Jayesh Madhani" and he has no idea who Plaintiff is, even though there are personal comments entered and his signature appears on the evaluation.

114. This is a false record.

115. This Medicine rotation was performed under the daily supervision and guidance of a different Physician, who wrote a recommendation for Plaintiff stating this fact.

## Expert Testimony

116. The Physician who performed Plaintiff's daily guidance and supervision on this Medicine rotation is an expert. He is the "Attending Hospitalist/Lead Physician". This Physician writes "I believe he will be an excellent physician" and "I highly recommend Rodney Rooks".

## How I obtained these records.

117. A few days into this CCH rotation Plaintiff spoke again with the medical student office about the difference between it's requirement of 8 weeks for Peds and Plaintiff's 6 weeks for Peds and OB/GYN. She said that the difference was "ok" and explained why. As we discussed this, she said "You can write down my name" , and Plaintiff did and she said "I can give you a copy of what's in your file", and Plaintiff said "ok".

118. A few months earlier, back in January, 2002, when Mr. Thompson's with SFC said "See you in Court" Plaintiff believed he was going to sue Plaintiff so Plaintiff thought Plaintiff should get all of Plaintiff's student loan information in order.

119. Plaintiff wrote to Sallie Mae for 7 months asking for these records but Sallie Mae failed to

respond at all when Sallie Mae is required to respond within "30 days" to this type of request under 34 C.F.R. § 682.208(c)(1).

120. Sallie Mae is required under 34 C.F.R. 682.511 (b)(vii) to keep these requests "all correspondence" as a requirement under (b) "Documentation required for claims".

121. On 7-22-02, SLM signed for Plaintiff's "Notice and Dispute".

### Failure of the student loan servicer, Sallie Mae, to exercise "due diligence" in the servicing of student loans under 34 C.F.R § 682.208(a)(c)(1).

34 C.F.R. § 682.208  Due diligence in servicing a loan.
   (a)  The loan servicing process includes..., responding to borrower inquiries,..
   (c)(1)  A lender shall respond within 30 days after receipt to any inquiry from a borrower....

122. Defendant Sallie Mae signed for Plaintiff's notice on July 22, 2002 but did not respond until September 19, 2002, 60 days later asking for "additional time".

123. Defendant Sallie Mae had a duty to respond "within 30 days".

124. Defendant Sallie Mae failed to comply with 34 C.F.R. § 682.208(a)(c)(1).

125. On 9-26-02, Sallie Mae sent true copies of the lender's promissory notes from SMU.

126. This promissory note has been changed at least 8 times (not by Plaintiff).

127. The total loan amount has been altered.

128. The initial "JR" appears beside it. This is a forgery. These are not Plaintiff's initials.

129. This title IV promissory note fails to carry the "School Name", "School Code Branch", "School Certification", "Signature of Authorized School Official", and the "Signature of Authorized Lending Official" as well as other information required by the Secretary for participation in the FFEL loan program.

130. The Guarantor is "Finance Authority of Maine".

131. The lender is "KEY BANK, USA C/O USA GROUP LOAN SERVICES"

132. The next title IV promissory note from SMU contains even less required information and

information requested of the borrower in several places is not the Plaintiff's handwriting.

133. The Guarantor is "Finance Authority of Maine".

134. The lender is "KEY BANK, KEY EDUCATION RESOURCES".

### 34 C.F.R. §682.206(b)   Due diligence in making a loan.

135.     34 C.F.R. § 682.206   Due diligence in making a loan.
(b) Processing forms.   Before disbursing a loan, a lender must determine that all required forms have been accurately completed by the borrower, the student, the school, and the lender. A lender may not ask the borrower to sign any form before the borrower has provided on the form all information requested from the borrower.

### Failure of a student lender to exercise "due diligence" in the making of a loan under 34 C.F.R. §682.206(b) (2 Counts)

136. Defendants, Guarantors and "lenders" Finance Authority of Maine, Key Bank USA, USA Group Loan Services, Key Bank and Key Education Resources failed to comply with 34 C.F.R. § 682.206(b) regarding these promissory notes.

137. Sallie Mae cannot claim that it did not know that these were not qualified education loans. Four documents, included with the promissory notes, shows that all of these loans have been flagged, twice, as of 9/26/2002. In four separate places on four separate documents it states, " *   FLAG ELECTRONIC APPLICATION   * ",  in capital letters and between stars.

138. On 12-2-02 (exhibit 149A), Sallie Mae signed again for another student loan "Notice and Dispute".

139. Sallie Mae completely ignored this notice and failed to respond to this notice at all when Sallie Mae is required under 34 C.F.R. 682.208(c)(1) to "respond within 30 days".

### Failure of a student loan servicer to exercise "due diligence" in the servicing of student loans under 34 C.F.R. § 682.208(a)(c)(1), (2 counts)

140. Defendant Sallie Mae signed for Plaintiff's second notice on December 2, 2001 but failed to respond at all when Sallie Mae had a duty to respond "within 30 days". Sallie Mae failed to comply

with 34 C.F.R. § 682.208(a)(c)(1).

141. Defendant Sallie Mae fails to list any loan as disputed at any time.

142. Plaintiffs were harmed by Defendants failure. Damages flow from Sallie Mae failure.

### **Plaintiff returned to Tallahassee, Florida in March of 2003.**

143. In March or April 2003, Plaintiff received an invitation to graduation from SMU, referring to him as a "Graduate", "Dear Graduates", "your diploma", signed by the president, Dr. Michael Harris, mentioning "graduation" 7 more times and congratulating me for "what you have accomplished".

144. Plaintiff contacted SMU to make graduation arrangements. Plaintiff spoke with Darlene Burke. Ms. Burke said Plaintiff owed SMU approximately $22,000. She said Plaintiff's graduation paperwork could not be processed until this was fully paid. Plaintiff told her that Plaintiff and Plaintiff's parents had already signed 2 loans for $29,000 and this could not be correct. Plaintiff asked Ms. Burke for an invoice.

145. Ms. Burke then said that Plaintiff would be allowed to graduate and said she would send an invoice if Plaintiff filled out some forms.

146. Ms. Burke mailed 4 documents to Plaintiff.

147. Plaintiff filled them out and faxed them back to SMU on 6-27-2003 at 11:15am.

148. Three days after Plaintiff faxed these back to SMU Ms. Burke sent the following invoice.

### **Invoice without CCH rotation and no origin,**
### **Affirmative act of Fraudulent Concealment (count 8)**

149. On 6-30-2003, at 3:33pm, SMU sent a fax of invoices to Plaintiff in Tallahassee, Florida, showing "Payments/Credits $-2,375.08".

150. The origin of this fax has been omitted, not by the Plaintiffs, and  "Feb.12. 1996" appears at the bottom of each page when this is not true.

151. Plaintiff believes this is a false statement and an attempt to conceal the origin of this fax.

152. The Cook County Hospital (CCH) rotation should be between "4/26/02" and "6/28/02", but it is not. It skips 1 month, the month of May 2001, which was the CCH rotation.

153. SMU's accountant, Darlene Burke, failed to charge Plaintiff for the CCH rotation. SMU should have charged Plaintiff for the CCH rotation because SMU had a greater awareness of this rotation than all other rotations.

154. Plaintiff believes that SMU's failure to charge for this rotation was intentional and meant to conceal the existence of the rotation because SMU was required to, and did, provide records and those records were fabricated by SMU.

155. After receiving this fax, Plaintiff spoke to Darlene Burke again. Plaintiff told her that Plaintiff disagreed with these invoices. She said " You have to pay whatever SMU says you owe".

156. On 9-3-2003, Sallie Mae states "A negative credit report can impact your future plans to purchase a home or car.", falsely describes these loans as "FFELP" loans when it had actual knowledge that they were not "FFELP" loans and misrepresents the character, amount and legal status of the debt.

157. Defendant Sallie Mae wrongly and unjustly damaged Plaintiff Julian Rodney Rooks Jr.'s credit ratings because it failed to exercise the required due diligence.

158. Damages flow from Sallie Mae's failure.

159. In 2005 Plaintiff received a certain and specific threat from an individual who claimed to be an employee of the US Department of Education "calling on behalf of St. Matthews University". Plaintiff drove from Tallahassee to the SMU office in Oviedo on or about 11-04-2005. Dr. Thornton introduced Plaintiff to several of the office staff in the following manner, "This is one of our Graduates, Dr. Rooks". There is a witness to these introductions.

160. Plaintiff met with Dr. Thornton for approximately 30 minutes in his office. Plaintiff told Dr. Thornton what the DOE had said. Plaintiff told Dr. Thornton about the financial crisis, harassing

telephone calls and the hardship Plaintiff's Parents and family were going through as we tried to keep up the student loan payments.

161. As Dr. Thornton looked through Plaintiff's student file he told Plaintiff that SMU would take back the account it had sent for collections if Plaintiff paid SMU $1,000.

162. Plaintiff paid SMU $1,000 at this meeting and SMU cashed the check.

163. Plaintiff asked Dr. Thornton for a transcript, approval to sit for the medical board exam and Plaintiff's diploma. He said that SMU could not do that as long as Plaintiff had a balance owed to SMU.

164. He said that if Plaintiff made a few payments of $400 that SMU would certify Plaintiff to take the board exam.

165. Plaintiff left SMU's office and began making payments of $400 but SMU still refused to allow Plaintiff to take the board exam or release a transcript.

### Affirmative act of Fraudulent Concealment (count 9)

166. Dr. Thornton failed to tell me that SMU had lost my records.

167. Dr. Thornton aggravated the damage to Plaintiffs by demanding and receiving more money.

168. Plaintiff has been wrongly denied the economic benefit of the MD degree.

### Dr. Jerry Thornton makes a lot of false and misleading statement to a State of California evaluation team.

169. The State of California's Division of Licensing evaluated SMU and issued a report. Page four describes "Jerry Thornton" as "the principal contact between SMUSOM and the Division". Page sixteen of this report focuses on SMU's relationship with St. Joseph's College of Maine (SJC) and contains several misrepresentations material to this case.

170. This statement, "the first SMUSOM students were concurrently enrolled in the SJCOM

MHSA program in the year 2000" is not true. The emails from SMU's Vice President to the Plaintiff are the proof that this was going on in January 1999.

171. This statement, "The principal benefit for SJCOM seems to be the income from tuition paid by the SMUSOM students" is not true. In fact, the exact opposite is true. The "principal benefit" was not "income from tuition paid by the SMUSOM (SMU) students" to SJC. The principal benefit was income from tuition paid to SMU using SJC's Stafford loan program.

172. This statement, "SMUSOM students enrolled in the MHSA program are enrolled separately in SJCOM and pay tuition and fees separately to the two institutions." is not true. The proof that the origin of SMU's tuition was SJC is in Plaintiff's emails from SMU's Vice President.

173. Dr. Thornton's false statements gave rise to misrepresentations made in an official report by the State of California.

174. Dr. Thornton misled the State of California in the same way Dr. Thornton misled Plaintiff.

175. Sometime between late 2007 and early 2009, Plaintiff had a face-to-face meeting with SMU's Chancellor Dr. McCutcheon, in his office at SMU in Orlando.

176. Dr. McCutcheon stated the following " You know, we could just say you forged your board application".

177. The Education Commission for Foreign Medical Graduates (ECFMG), is the board testing authority who administers the board exams.

178. Dr. McCutcheon said this because SMU sent fake/false/fabricated certifications to the ECFMG in the same way SMU sent fake/false/fabricated records to CCH because SMU sent that certification to the ECFMG after it lost the records in June 2001.

179. That is why SMU has the ECFMG number on Plaintiff's official transcript but it is blank on the official transcripts from 2002.

180. Defendant St. Matthews University permanently damaged Plaintiff when it sent this fake/false/fabricated certification to the ECFMG.

181. Plaintiff asked Dr. McCutcheon if Plaintiff could look at Plaintiff's file or get a transcript. He said "No".

### Affirmative act of Fraudulent Concealment (count 10)

182. Plaintiffs ask the Court to consider this meeting with SMU to be an act of fraudulent concealment because SMU's Chancellor, Dr. Gary McCutcheon, failed to tell Plaintiff that SMU had lost the Plaintiff's records.

183. In January 2009, Plaintiff resolved to pay SMU however much it wanted in order to sit for the board exam and graduate.

184. SMU's response was that they were missing some records.

185. Plaintiff sent them the records they said they were missing. Plaintiff sent them their own records (pages 1-12 of Dr. Apantaku's fax to Cook County Hospital, but not pages 13 and 14) without realizing the significance of these documents.

186. SMU acknowledged receiving them.

187. SMU saw that these records came from Dr. Apantaku's office and SMU threw him under the bus in a letter claiming that SMU had not received their own records from Dr. Apantaku.

188. SMU specifically asks for the CCH rotation, as Dr. McCutcheon had also done because it was fishing for pages 13 and 14 of Dr. Apantaku's fax to CCH and more importantly, the second fax directly from SMU itself which shows SMU knew it had a duty to keep the records and that the records it provided were fabricated.

189. This letter says that Plaintiff was placed in a "Withdrawn status" on April 24, 2003 before Plaintiff was offered graduation. This is a false statement.

190. Page 7 of the State of California report from 2005 states "Among those listed as

withdrawn, the present status of 101 is unknown.".

191. The emails from this exchange with SMU's registrar, Jennifer Applequist, shows how SMU moves the goalposts by adding all sorts of additional requirements for Plaintiff to graduate, that Plaintiff would have to pay them about $17,000 and that then Plaintiff would have to "reapply". It did not sound good so Plaintiff asked pointblank about being re-accepted and SMU's response was "It is not guaranteed."

<u>**A letter to the US Department of Education.**</u>

192. On June 22, 2009, at 1:11pm, a cover letter and "written comments" were sent to Wendy Macias at the United States Department of Education (DC01/2235039.9).

193. The writer writes, "The Guidelines offer an excellent framework for ensuring that Title IV funds are provided only to those eligible medical schools the DOE is certain are accredited...".

194. Plaintiff believes Rodger Courtney is the author.

195. Plaintif believes Mr. Courtney's name and business name (Global Education Resources (GER)) are redacted are because his statements are the exact opposite of his acts.

196. Plaintiff requested an official transcript from SMU and on or about June 1, 2010, SMU mailed Plaintiff an official transcript.

197. Plaintiff's official SMU transcript can be best understood by drawing a line down the middle dividing it into side A and side B.

## SIDE B-DELETED RECORDS

198. Side B is missing the entire summer semester 2001 and the CCH rotation but these are not the records SMU lost. These are the records that SMU intentionally deleted to conceal when it lost the records (summer 2001) and when it had provided the fake records (the CCH rotation).

## SIDE A – THE LOST RECORDS

199. Side A are the records SMU lost in June of 2001.

200. Side A is almost completely incorrect, and it does not match the official transcript SMU sent to CCH twice.

## Case evaluation by an attorney.

201. In January, 2013, Plaintiff spoke with an attorney. He told Plaintiff that Plaintiff had a claim for half of $29,000, but no more. He told Plaintiff to "forget it". He said "SMU will get away with whatever it was they did". Before letting Plaintiff go he made Plaintiff repeat these words after him, "Everything I hear is a lie."

## North Florida Legal Services.

202. In 2013, Plaintiff went to North Florida Legal Services (NFLS). Plaintiff spoke with someone at the appointment for approximately fifteen minutes. He said "I think you're a nice guy, but I have a waiting room full of houses to save". He asked Plaintiff to leave and escorted Plaintiff out the door.

## When did I discover my cause of action(s)?

203. In the Summer of 2014, Plaintiff began preparing Plaintiff's Chapter 7 case when Plaintiff received 2 letters from the Lenders and Servicer on behalf of Sallie Mae. These carefully crafted words, "the circumstances that resulted in this suspension of offset change." made the Plaintiff remember the words "Everything I hear is a lie" and Plaintiff decided to review the evidence from a different perspective. Sometime in the Summer of 2015, I realized that what I was looking at, and what was hidden, was not a group of isolated, unrelated events but rather a group of related events designed to conceal a single event (loss of records in June 2001) and these more numerous events, acts, omissions and statements were the shape and form of a cover up designed to conceal this single event, the Plaintiff's cause of action and the overarching cause of action- the concealment itself.

## Why Plaintiff's cause of action was not discovered sooner.

204. It took Plaintiff this long to determine Plaintiff's cause of action because that cause of action was concealed.

### When the False Claims were filed.

205. In May, 2014, Plaintiff has good reason to believe the claims had not yet been filed.

206. On 7/21/2014, Plaintiff obtained his credit report. All of the loans at issue in this Complaint are reported as "Claim filed with government","Balance paid".

205. On September 26, 2014, Plaintiff received notice from the US Department of Education that the DOE "now holds" the loans at issue in the complaint and a letter from Sallie Mae on October 1,2014 essentially stating the same. Plaintiff is unsure of an exact date on which the claims were filed but believes it to be sometime around June, 2014.

### Sallie Mae fails to exercise "due diligence"
### in the collecting of student loans under 31 U.S.C. § 682.509(b),
### "Special conditions for filing a claim." (4 counts)

34 C.F.R. § 682.507(a)(1)...a lender shall exercise due diligence in the collection of a loan...
34 C.F.R. § 682.509  Special conditions for filing a claim.
    (b) A lender may not as a result of a claim filed with the Secretary under this section report a borrower's loan as in default to any credit bureau or other third party.

206. Defendant Sallie Mae reported Plaintiff's loans as in default, "Defaulted" to a credit bureau, after the claim was filed "Claim filed with government"at least 4 times.

207. Defendant Sallie Mae  failed to exercise the required "due diligence" in the collecting of a student loan under 34 C.F.R. § 682.509(b).

208. The failure of Defendant Sallie Mae to comply with the requirements of this part injured the Plaintiff.

209. Damages flow from Defendants Sallie Mae's failure.

### First cause of Action;
### 31 U.S.C. § 3729(a)(1)(B) knowingly makes, uses, or causes to be made or used, a
### false record or statement material to a false or fraudulent claim; (2 counts)

210. Plaintiff re-alleges and re-incorporates paragraphs 1-209 of this Complaint as though fully set forth herein.

211. SMU knowingly made a false record material to a false or fraudulent claim by substantial misrepresentation, fraudulent concealment, a false statement, a fraudulent inducement, and a prohibited transaction used as an incentive, in making the contract, (2 counts).

**Second cause of Action;**
**31 U.S.C. § 3729(a)(1)(A) knowingly causes to be presented, a false**
**or fraudulent claim for payment or approval; (2 counts)**

212. Plaintiff re-alleges and re-incorporates paragraphs 1-211 of this Complaint as though fully set forth herein.

213. Defendant SMU's failure to disclose the loss of the Plaintiff's records caused a false or fraudulent claim to be presented for payment or approval, (2 counts).

**Third cause of Action;**
**31 U.S.C. § 3729(a)(1)(B) knowingly makes, uses, or causes to be made or used, a**
**false record or statement material to a false or fraudulent claim; (2 counts)**

214. Plaintiff re-alleges and re-incorporates paragraphs 1-213 of this Complaint as though fully set forth herein.

215. Defendant Sallie Mae knowingly uses, and causes to be used, a false record material to a false or fraudulent claim by using promissory notes it knew were flagged 4 times, contained 64 blank spaces, 7 cross-outs, 5 forgeries and a lot of "missing information" required under 34 C.F.R. § 682.206(b).

**Prayer for Relief**

WHEREFORE, Plaintiffs request the following relief:

Plaintiff has rights under the Crime Victims Rights Act (CVRA), 18

U.S.C. § 3771 et seq., and, under 18 U.S.C. § 3771(e), are "a person directly and

proximately harmed as a result of the commission of a Federal offense".

1. Judgment in favor of the United States against Defendants, jointly and severally, by reason of the Defendants acts as set forth above and Defendants failure to comply with the provisions of the False Claims Act, in an amount equal to three times the amount of damages sustained by the United States and a civil penalty of "not less than $5,000 and not more than $10,000", for each violation, "plus 3 times the amount of damages which the Government sustains", pursuant to 31 U.S.C. § 3729(a).

2. Award to Relator, as the *Qui Tam* Plaintiff, the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) on recovery by the United States;

3. Award Relator all reasonable expenses the Court finds to have been incurred, plus costs and all other allowable fees;

4. Punitive damages on all causes of action, to the extent allowable by law;

5. and any such other relief the Court may deem just and proper.

Plaintiff requests the above relief and such other and further relief as this Court may deem just and proper.

## **Demand for Jury Trial**

Plaintiff demands a trial by Jury, pursuant to Fed.R.Civ.P Rule 38 . Per Local Rule 90151-1B., Plaintiff give consent in the affirmative.

Respectfully submitted,

DATED: 4/11/2016

*Qui Tam* Plaintiff

Julian Rodney Rooks Jr.
3648 Dartford Lane
Tallahassee, Florida, 32311
(850) 329-7019

27 of 28